PETER STIRBA (Bar No. 3118)
JULIA D. KYTE (Bar No. 13113)
JEFFREY D. MANN (Bar No. 13795)
**STIRBA, P.C.**
215 South State Street, Suite 750
P.O. Box 810
Salt Lake City, UT 84110-0810
Telephone: (801) 364-8300
Email:  jkyte@stirba.com
***Attorneys for Plaintiff LeGrand P. Belnap, M.D.***

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LEGRAND P. BELNAP, M.D.,<br><br>        Plaintiff,<br><br>v.<br><br>IASIS HEALTHCARE CORPORATION, a Delaware corporation; SALT LAKE REGIONAL MEDICAL CENTER, L.P., a Delaware limited partnership, D.B.A. SALT LAKE REGIONAL MEDICAL CENTER; BEN HOWARD, M.D.; ALAN DAVIS, M.D.; ANGELO CHACHAS, M.D.; WANDA UPDIKE, M.D.; KATHY OLESON; and DOES 1-10.<br><br>        Defendants. | **COMPLAINT**<br><br>**AND JURY DEMAND**<br><br><br>Case No. 2:14-cv-00086<br><br>Magistrate Judge Evelyn J. Furse |

        Plaintiff, LeGrand P. Belnap, M.D., by and through undersigned counsel, STIRBA, P.C.,

hereby complains, alleges, and avers against Defendants as follows:

## PARTIES

1.      Plaintiff LeGrand P. Belnap, M.D., ("Dr. Belnap"), is an individual and has been at all relevant times, a resident of Salt Lake County, State of Utah.

2.      Defendant Iasis Healthcare Corporation, ("Iasis") is a corporation duly organized under the laws of the State of Delaware.  On information and belief, Iasis owns and/or operates the facility known as Salt Lake Regional Medical Center located in Salt Lake City, Salt Lake County, Utah and at all relevant times was doing business in the State of Utah.

3.      Defendant Salt Lake Regional Medical Center, LP, is a limited partnership duly organized under the laws of the State of Delaware and at all relevant times was doing business as Salt Lake Regional Medical Center ("SLRMC" or the "Hospital"), in the State of Utah.

4.      At all relevant times, Defendant Ben Howard, M.D. ("Dr. Howard") was an anesthesiologist at SLRMC and was the Chief of Staff Elect on the Medical Executive Committee (the "MEC") at SLRMC.  Defendant Dr. Howard acted on behalf of himself and SLRMC.

5.      At all relevant times, Defendant Alan Davis, M.D. ("Dr. Davis") was a physician at SLRMC with a specialty in physical medicine and rehabilitation and was the Chief of Staff on the MEC at SLRMC.  Defendant Dr. Davis acted on behalf of himself and SLRMC.

6.      At all relevant times, Defendant Angelo Chachas, M.D. ("Dr. Chachas") was a physician at SLRMC with a specialty in general surgery and was the Chief of Surgery and a member of the MEC at SLRMC.  Defendant Dr. Chachas acted on behalf of himself and SLRMC.

7.     At all relevant times, Defendant Wanda Updike, M.D. ("Dr. Updike") was a physician at SLRMC with a specialty in infectious disease and a member of the MEC at SLRMC. Defendant Dr. Updike acted on behalf of herself and SLRMC.

8.     At all relevant times, Defendant Kathy Oleson, ("Ms. Oleson") was a Risk Manager for SLRMC.  Defendant Ms. Oleson acted on behalf of herself and SLRMC.

9.     Plaintiff is unaware of the true names and identities of those Defendants herein designated as Defendant Does 1-10 and, therefore, sues them under such fictitious names. Plaintiff is informed and believes, and thereon alleges that said fictitiously named Defendants are responsible, in full or in part, through their acts or omissions, for the damages and injuries alleged herein. Plaintiff will amend this Complaint when the true identities of said Defendants become known.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1367.

11.     Venue in this action is proper in this Court pursuant to 28 U.S.C. § 1391.  All of the events of which Plaintiff complains took place in Salt Lake County, State of Utah.

## GENERAL ALLEGATIONS

### Factual Background

12.     Dr. Belnap is a duly licensed physician who has been licensed in the State of Utah since 1974. Dr. Belnap is a general surgeon with special expertise in organ transplantation and complex cancer cases.  Dr. Belnap is board certified and is a member of several medical societies including the American College of Surgeons, the American Society for Bariatric Surgery, and

the American Medical Association. He is a recipient of the American Cancer Society Humanitarian award, which is given for compassionate care toward patients. He has also been the recipient of the Best of State Award for medical innovation in Utah. The National Kidney Foundation recognized Dr. Belnap for his important contributions in organ transplantation.  Dr. Belnap received a special achievement award from the Utah Medical Association and the Utah Academy of Physician Assistants gave Dr. Belnap the Physician of the Year Award in 2012.  Dr. Belnap's extensive surgical background and experience benefits those patients he serves.  Prior to the actions of Defendants complained of below, Dr. Belnap was one of the most consulted surgeons in Utah, with referrals from physicians throughout the Western United States.

13.     During the time period at issue, Dr. Belnap had privileges at two facilities.  The first was South Towne Surgery Center ("STSC") located in Sandy, Utah. STSC is an ambulatory surgical center which is only equipped for same-day surgery.  Same-day, or out-patient, surgery entails procedures where the patients can go home the day of the surgery and does not require an overnight hospital stay.   Dr. Belnap rarely performs any procedures at STSC because he generally does not perform out-patient surgery.

14.     Since 2009, Dr. Belnap has also had active staff membership with full surgical privileges at SLRMC.

15.     Historically, SLRMC has been a general and acute care licensed Hospital in Salt Lake City, Utah. SLRMC offers to its patients general and specialized surgical services, including advanced gastric, hepatic, and pancreatic surgical services.

16.     Dr. Belnap came to SLRMC in 2009 because it was indicated to him by then CEO, Mr. Jeff Frandsen, that the Hospital wanted to develop and implement additional services

and improvements of its abdominal surgery with particular emphasis on providing surgical services involving the liver, kidney, pancreas, and intestines.  The Hospital sought to engage Dr. Belnap because, with his knowledge and experience, Dr. Belnap could provide surgical services management, introduce new procedures, oversee the improvements needed, and advance the quality of the surgeries themselves.  Dr. Belnap was appointed Surgical Director of the ICU, with the hope that he would improve care.

17.     Prior to the actions of Defendants complained of below, Dr. Belnap performed a significant percentage of all abdominal surgeries and related patient services at SLRMC.

18.     The abdominal surgeries and related services performed by Dr. Belnap at SLRMC made up the majority percentage, if not almost the entirety, of Dr. Belnap's practice.

19.     As a general surgeon with special expertise in organ transplantation and complex cancer cases, Dr. Belnap and his patients were dependent upon the provision of the surgical facilities, equipment, medicine, over-night or extended care, and staff provided at SLRMC.  The only way a surgeon, such as Dr. Belnap, has access to such facilities is by being an active staff member and afforded privileges by the Hospital.

20.     Prior to the actions of the Defendants, the Hospital promised Dr. Belnap that an advanced abdominal center of excellence (the "Center") would be created for him to oversee. The creation of the Center would have increased the quality and access to specialty services related to abdominal surgeries to patients, which would have strengthened competition and therefore benefited patients and the surgical health care system at SLRMC as a whole.

21.    In addition to the Center, the Hospital promised Dr. Belnap that it would provide a dedicated team to work with him in surgery and in the ICU.  The Hospital also promised to provide specialty surgical instruments to facilitate his operations.

22.    The Hospital's continuing failure to complete the Center or fulfill the associated promises has harmed Dr. Belnap by damaging his competitiveness in the intermountain area, and eliminated patients' access to the services that Dr. Belnap could provide to the market.

**SLRMC's Suspension of Dr. Belnap's Privileges and Request for Revocation**

23.    On March 18 of 2013, the MEC enacted a summary suspension of Dr. Belnap's medical privileges based on the complaint of a female employee at SLRMC regarding a triggering event that allegedly occurred near a Hospital elevator, and other allegations of prior incidents. The suspension was unrelated to any issues of patient care.  On March 25, 2013, the MEC voted to continue the summary suspension. The effect of this suspension was to permanently harm Dr. Belnap's professional reputation, the full extent of which remains unknown to date, and to unlawfully restrain competition.   Furthermore, Defendants' actions regarding the suspension violated the Hospital's bylaws, which constitutes a breach of contract.

24.    SLRMC's Bylaws of the Medical and Dental Staff ("Bylaws") state, in pertinent part:

> 8.1 (c) Investigation by the Medical Executive Committee.
>
> ***The MEC shall appoint an Ad Hoc Committee*** at the MEC's next regular meeting to investigate and/or perform peer review of the Practitioner or AHP.  ***Such Ad Hoc Committee shall be composed of at least three (3) Practitioners within the Department or Specialty practiced by the individual*** for whom an investigation or peer review is requested ("Peers") . . . . If an individual for whom an investigation or peer review is requested has no Peers within the Hospital . . . external Peer reviewers shall be engaged . . . . [W]ithin thirty (30)

days for corrective action after the investigation begins, ***a written report of the investigation shall be completed.***[1]

25.     Defendants did not create an Ad Hoc Committee of three (3) practitioners in Dr. Belnap's department or specialty, or retain external practitioners, to conduct the investigation. Instead, the Hospital's main investigator was outside counsel – an attorney, not a medical practitioner – and he did not provide a written report to the MEC, rather he created an internal memorandum and only reported his findings over the telephone.

26.     Further, despite the MEC receiving a recommendation from their attorney that the allegation regarding the "elevator event" did not rise to the level of a sexual harassment claim, the MEC still voted to continue the suspension of Dr. Belnap, the harshest sanction available. The MEC's decision had the effect of a revocation of Dr. Belnap's staff membership and clinical privileges at SLRMC.

27.     SLRMC's Bylaws give a range of options for possible action the MEC can take upon receipt of the investigational report. The options range from rejecting the request for corrective action, to recommending the revocation of Medical Staff Membership as the harshest sanction.[2]

28.     Dr. Belnap attempted to reach an informal resolution with the MEC that would have permitted him to return to SLRMC. However, the MEC rejected Dr. Belnap's written proposal for a resolution.  Soon thereafter, Dr. Belnap requested a Fair Hearing to challenge the MEC's decision to summarily suspend him and effectively revoke his privileges and staff membership.

---

[1] *See* Bylaws, Section 8.1(c) (emphasis added).
[2] *See* Bylaws, Section 8.1(d).

29.     On April 22, 23, and 24, 2013, a Fair Hearing was held at SLRMC.  The Hearing was conducted by a Fair Hearing Committee ("FHC") composed of three physicians and commenced at 5 p.m. each evening for three (3) consecutive days.

30.     On June 4, 2013, the FHC released its Report of the Hearing.  According to the Report, the FHC found the MEC's actions on the whole were not supported by the evidence, and were arbitrary and capricious.   The FHC's recommendation was to vacate the summary suspension and the MEC's recommendation for revocation of Dr. Belnap's privileges.

31.     On June 11, 2013, Dr. Belnap received confirmation that the MEC met and decided to make no changes to the FHC's recommendation to vacate the suspension and to return Dr. Belnap's full medical staff privileges.  Subsequently, the Board of Trustees met and voted to adopt the MEC and FHC's recommendations and vacated the suspension in full.

<u>**Defendants' Malicious Conduct and Actions Lacking in Good Faith**</u>

32.     SLRMC's Bylaws state, in pertinent part:

<u>8.1(a) Criteria for Initiation of Corrective Action</u>

Procedural guidelines from this Section 8.1 of the Bylaws, the Fair Hearing Plan (see Section XVI) and from the Health Care Quality Improvement Act as applicable shall be followed for all Practitioners and any and all peer review and / or corrective action ***shall be taken in good faith*** in the interest of quality patient care . . . .[3]

33.     SLRMC's Bylaws further state:

a. <u>14.7(c) Action in Good Faith.</u>

***The representatives of the Hospital***, including its Board, CEO, administrative staff, and Medical Staff ***shall not be liable*** to a Practitioner or AHP for damages or other relief for any action taken

---

[3] *See* Bylaws, Section 8.1(a) (emphasis added).

> or statement of recommendation made within the scope of such
> representative's duties, ***if such representative acts in good faith and
> without malice after a reasonable effort to ascertain the facts and
> in a reasonable belief that the action, statement or recommendation
> is warranted by such facts***.  Truth and/or good faith shall be (a)
> defense(s) in all circumstances.[4]

34.     SLRMC and its Defendant representatives violated these provisions by acting in

bad faith and with malice in relation to Dr. Belnap's suspension.

35.     Representatives of SLRMC worked both independently and conspired together to

enact the suspension and improperly remove Dr. Belnap from the Hospital.   This unlawful

conduct harmed Dr. Belnap, personally and professionally, as well as patients that could not

obtain his services.    Actions evidencing SLRMC's representatives' lack of good faith

surrounding Dr. Belnap's suspension include, but are not limited to, the following:

> a.  <u>SLRMC's Representatives' Acts of Malice</u> – There is evidence demonstrating
> that physicians at SLRMC were acting with malice to try to get Dr. Belnap
> removed from the Hospital.  For example, Dr. Belnap's P.A. Cary Drury, was
> a participant in an exchange involving one of the Defendant physicians, Dr.
> Davis, head of the MEC, where Dr. Davis indicated that he was going to get
> Dr. Belnap fired. Ms. Drury also tried to help Dr. Belnap get the Center he
> had been promised. Ms. Drury was told by SLRMC's administration that it
> was probably best if she found another job or a "Plan B".

> b.  <u>Failure to Properly Investigate the "Elevator Event"</u> – The allegation was that
> Dr. Belnap, as he stepped out of an elevator, reached out as if to touch a
> female employee near her midsection.  There were four (4) witnesses, in
> addition to Dr. Belnap), but only three (3) of them were interviewed by the
> Human Resources Director regarding the allegation.   The complainant
> indicated that Dr. Belnap made a gesture towards her midsection.  One of the
> female witnesses indicated that she saw Dr. Belnap gesture towards the
> complainant. The male individual witness indicated that he did not see any
> gesture of Dr. Belnap. The other final female witness also did not see any
> gesture of Dr. Belnap as claimed but was not interviewed until later when the
> investigation was taken over by outside counsel. Dr. Belnap denied any

---

[4] *See* Bylaws, Section 14.7(c) (emphasis added).

wrongdoing and told the interviewers to contact another physician on staff who had evidence that the complainant had previously made unsupported claims. The on-staff physician had knowledge that the complainant not only had asserted false claims against him personally, but that she had also asserted claims against a physician at another hospital, which caused that physician to leave town. One of the interviewers refused to follow up on Dr. Belnap's recommendation. Finally, SLRMC's investigating attorney reported to the MEC that Dr. Belnap's alleged gesture towards the complainant during the "elevator event" did not constitute a sexual harassment claim.

c. <u>Failure to Fully Investigate the Other Events or Alleged Behavior</u> – In addition to not completing a full investigation regarding the "elevator event," SLRMC also did not conduct an adequate investigation regarding the other allegations addressing Dr. Belnap's behaviors or conduct within the Hospital that purportedly were also considered by the MEC. At least sixteen (16) individuals that were supportive of Dr. Belnap were not interviewed.

d. <u>SLRMC's Misuse of the Unusual Occurrence Reports ("UORs")</u> – In March of 2013, the MEC met to discuss Dr. Belnap's behavior and the investigation results. At the meeting the MEC was given some UORs concerning Dr. Belnap prior to the MEC's vote on what action to take regarding Dr. Belnap. Members of the MEC did not read all of the UORs presented and did not understand that many of the UORs were not critical of Dr. Belnap. UORs are typically used at SLRMC to track trends and medical care. However, in this instance the UORs were misused to persuade the MEC that there was enough evidence to justify a suspension even though patient care was not at issue.

e. <u>SLRMC's Representatives' Misuse/Concealment of Evidence</u> – After the Fair Hearing concluded in April of 2013, it came to Dr. Belnap's attention that SLRMC improperly submitted information as evidence at the hearing through an undated and redacted letter that was critical of Dr. Belnap. On May 4, 2013, Dr. Belnap submitted a response from the author of that letter for the FHC's consideration. SLRMC's risk manager intentionally misused the letter, against the author's direct request, knowing full well it had been recanted. SLRMC concealed that fact, and still used the letter against Dr. Belnap during the Fair Hearing proceedings.

36.    Although Dr. Belnap was returned his full surgical privileges at the Hospital in June of 2013, SLRMC's representatives continued to unfairly target him.

37.    On June 24, 2013, SLRMC's counsel voided a report sent to the National Practitioner Data Bank regarding Dr. Belnap's suspension. However, SLRMC failed to notify

other organizations that the report had been retracted, which triggered inquiries from various entities.  SLRMC did not adequately correct the factual record after the conclusion of the Fair Hearing proceedings, which caused Dr. Belnap further harm and expense.

38.    Also, on August 27, 2013, a letter was issued by the interim CEO at SLRMC indicating that Dr. Belnap's reappointment to the Active Medical Staff at SLRMC and renewal of privileges had been "extended" for three months.  This was not a normal renewal cycle for staff membership or privileges of physicians in accordance with SLRMC's Bylaws. Under Section 3.4(c) of the Bylaws, reappointments to the Medical Staff and re-granting of Clinical Privileges are usually for two (2) year periods.

39.    Allegedly, this extension was recommended because Dr. Belnap's reappointment application was not sent to him due to the Fair Hearing process. Apparently, Dr. Belnap only had a revised medical staff period from February 1, 2013 to October 31, 2013.

40.    The August 27, 2013 letter improperly referenced the Fair Hearing process and did not indicate that Dr. Belnap was cleared of all allegations of wrongdoing.  The inclusion that there was a Fair Hearing and a limitation on Dr. Belnap's active staff membership or privileges is injurious to Dr. Belnap as while it is true that a Fair Hearing occurred at Dr. Belnap's request, it is not true that any limitation or "extension" was applied thereafter as a result, other than what should have been a normal renewal cycle of his privileges.

41.    Dr. Belnap is required to submit routine updates to regulatory and insurance entities confirming the status of membership and privileges at SLRMC. The unprotected letter and information published within it, which implies that some fault was allocated to Dr. Belnap, has been and will continue to be harmful to Dr. Belnap both personally and professionally.

42.     Dr. Belnap's practice has been severely damaged by the summary suspension because it is widely known to have occurred within the medical community.   During the suspension he lost two capable employees that were forced to find other work.   Since the suspension, referrals from other physicians have significantly declined.   Competent staff and referrals from other physicians are critical to his success as a surgeon.

43.     Furthermore, the suspension and SLRMC's improper actions have subjected Dr. Belnap to continuing damage.   In January of 2014, Dr. Belnap received a letter from Molina Healthcare of Utah indicating that his provider participation in the Molina Healthcare network had been terminated.   Dr. Belnap had been placed on an early re-credentialing track, and then the Credentialing Committee voted thereafter to terminate, apparently because Molina "received notification that [he] no longer ha[s] hospital privileges at Salt Lake Regional Medical Center."

44.     Finally, despite being cleared by the FHC, and despite the testimony of nurses and other physicians that supported Dr. Belnap at the Hearing, SLRMC's representatives are still determined to get Dr. Belnap removed from the medical staff at the Hospital.   Dr. Belnap is aware that SLRMC representatives pulled certain medical charts, not in the usual course or standard practice of the Hospital.   While no issue with patient care has been brought to his attention, SLRMC representatives continue to conspire against him to find a reason to initiate another peer review action.   In addition, while Dr. Belnap is trying to obtain staff membership and privileges with other health care entities, SLRMC's representatives have issued an additional release requirement before they will respond to credentialing inquiries from those entities.   These actions imply there is a problem and are interfering with Dr. Belnap's prospects for future employment elsewhere.

45.     Dr. Belnap tried to resolve the issues raised above without litigation but his efforts were rejected by SLRMC.   Therefore, Dr. Belnap files this lawsuit to stop SLRMC, its representatives, and other competitors named as Defendants, from continuing their efforts to terminate Dr. Belnap's privileges at the Hospital.  Defendants have been and continue to engage in malicious actions lacking in good faith in an effort to remove Dr. Belnap from the market and damage his ability to practice as a surgeon.  The suit is also brought to seek the return of Dr. Belnap's good name in the medical community as well as address a monetary remedy from the Defendants whose conduct has caused significant financial and reputational damage to Dr. Belnap.   Defendants' unlawful conduct has damaged Dr. Belnap's practice, and in turn, negatively affected competition in the marketplace.

## FIRST CAUSE OF ACTION
**(Combination and Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act Against All Defendants**)

46.     Plaintiff hereby incorporates paragraphs 1 through 45 above.

47.     Defendants engaged in a verbal contract, combination, or conspiracy, and/or concerted action by committing to a common scheme with an illegal objective; to eliminate Dr. Belnap as a competitor by suspending his privileges and eliminating his patients' access to his services in the medical care market.

48.     Defendants, and specifically the individual Defendant physicians, are either Dr. Belnap's competitors or have an interest in Dr. Belnap being removed to ensure that the individual Defendant physicians have a larger share of the market.  Defendants' illegal concerted actions not only prevented patients' access to the supply in the market by forcing patients to choose from the Hospital's approved surgeons, but Defendants' unlawful efforts have also

prevented the creation of Dr. Belnap's specialty abdominal or transplant center in the marketplace, thereby reducing future competition, in violation of federal anti-trust laws.

49.     Defendants' efforts to eliminate Dr. Belnap, reduce competition, and prevent the market entry of a new and more efficient transplant or abdominal surgery specialty center in the marketplace have also succeeded, inter alia:

> a.  By limiting, reducing or eliminating Dr. Belnap's services from the significant percentage of the marketplace he served prior to Defendants' conduct;
>
> b.  By limiting, reducing or eliminating Dr. Belnap's services from the significant percentage of the marketplace he would have served but for Defendants' conduct;
>
> c.  By limiting, reducing or eliminating access to and the choice and/or option of patients in the marketplace from utilizing the services of Dr. Belnap for their treatment;
>
> d.  By tarnishing the reputation of Dr. Belnap in the marketplace by effecting a suspension that Dr. Belnap has to report to other organizations, thereby reducing or eliminating Dr. Belnap's ability to provide medical services to other facilities within the marketplace and elsewhere;
>
> e.  By eliminating Dr. Belnap's access to surgical facilities, equipment, medicine and staff, during his suspension and by not creating the Center promised to him, Defendants are thereby prohibiting Dr. Belnap's ability to properly care for and treat patients and, in turn, engage in his lawful profession and earn a living.

50.     Defendants' unlawful actions in furtherance of their verbal contract, combination, or conspiracy with concerted action to achieve an illegal objective to eliminate Plaintiff as a competitor, reduce competition, reduce quality, avoid price competition and prevent the entry of a new and efficient abdominal surgery specialty center in the marketplace have caused irreparable harm and damage to Dr. Belnap, to patients in the marketplace, and to interstate commerce.

51.     Defendants' unlawful actions ensured that Dr. Belnap was not able to perform surgical procedures and significantly limited his ability to properly care for and treat his patients. Further, a portion of the nursing staff at SLRMC did not work during the suspension because the caseload at the Hospital was not busy enough without Dr. Belnap there.  Likewise, patients were deprived of access to, and the option of being treated by Dr. Belnap, who was a significant source of the surgical services offered to patients at SLRMC.

52.     Defendants' actions were and are in violation of federal anti-trust laws and entitle Dr. Belnap to threefold actual damages to be proven at trial, punitive damages, attorney fees, as well as costs under 15 U.S.C. § 15(a), and all other relief deemed just and proper by this Court.

## SECOND CAUSE OF ACTION
### (Breach of Contract Arising For Violation of the Bylaws Against SLRMC)

53.     Plaintiff hereby incorporates paragraphs 1 through 52 above.

54.     The governing Bylaws at SLRMC are a contract between the hospital and the physician.

55.     SLRMC's representatives breached that contract when they failed to follow proper investigation procedures under Section 8.1(c) of the Bylaws.

56.     SLRMC's representatives breached the contract when they sought the harshest sanctions possible under Section 8.1(d), when the evidence did not support the recommendations.

57.     The Hospital's actions described above breached the contract in at least the following respects:

    a.  Invocation of a suspension was improper to start because it was based on certain SLRMC's representatives' personal animus and desire to get Dr. Belnap "fired";

     b.   The process prior to, and during, the suspension of Dr. Belnap was flawed; and

     c.   The process was flawed because SLRMC's representatives wanted to make the suspension with recommendation for revocation stick at all costs, and so misused evidence in an unlawful manner to achieve that result.

58.    SLRMC's representatives also breached the contract by failing to act in good faith while enacting the suspension and pursuing peer review and corrective action against Dr. Belnap, in violation of Sections 8.1(a) and Section 14.7(c) of the Bylaws. SLRMC and its representatives are not immune from liability given their failure to act in good faith.

59.    Even though Dr. Belnap's privileges were eventually restored, the summary suspension remains a part of Dr. Belnap's permanent record.  The fact that it was unlawfully imposed, and the fact that it remains on his record, has caused and will continue to cause substantial damage to Dr. Belnap both personally and professionally.

60.    As a result of Defendants' actions, Dr. Belnap seeks to recover his actual damages as proven at trial, together with his reasonable attorneys' fees, court costs, and interest as allowed by law.

<u>**THIRD CAUSE OF ACTION**</u>
**(Breach of Implied Covenant of Good Faith and Fair Dealing Against SLRMC)**

61.    Plaintiff hereby incorporates paragraphs 1 through 60 above.

62.    Every contract contains an implied covenant of good faith and fair dealing. Defendants breached this covenant by and through their actions made in bad faith and with malice to achieve the suspension of Dr. Belnap, in violation of SLRMC's Bylaws and specifically Sections 8.1(a), (c), and (d), as well as Section 14.7(c).

63.     Said conduct has caused and is continuing to cause Plaintiff direct and substantial economic damage, including costs of attorneys' fees and costs, for which Plaintiff seeks actual damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Defamation and/or Defamation *Per Se* Against All Defendants)**

64.     Plaintiff hereby incorporates paragraphs 1 through 63 above.

65.      Defendants published statements, both orally and in print, that were not true, nor protected and have caused damage to Dr. Belnap.  The statements have harmed Dr. Belnap's reputation in addition to creating doubt within the medical community regarding his fitness to practice medicine.

66.     Defendants' production of the August 2013 letter implies that a limitation was placed on Dr. Belnap's privileges at SLRMC after the Fair Hearing.  This implication is misleading, false, and implies that Dr. Belnap is not meeting the standard of care within his medical profession and that Dr. Belnap is not fit to engage in his profession.

67.     On information and belief, Defendants also provided notification to Molina Healthcare that Dr. Belnap no longer had privileges at SLRMC, which is false and also implies that Dr. Belnap is not meeting the standard of care within his medical profession and that Dr. Belnap is not fit to engage in his profession.

68.     Dr. Belnap must report to other insurance agencies that Molina has terminated his participation in its network.  If Dr. Belnap is not able to reverse that decision, any report that he is required to submit will trigger audits, which may lead to his exclusion from participation on other health insurance panels, effectively ending his career.

69.     On information and belief, SLRMC's representative physicians and risk managers have made false oral statements to third parties at the Hospital and in the medical community outside of the privileged Fair Hearing proceedings, alleging that Dr. Belnap committed wrongful acts sufficient to justify his suspension.

70.     These representations were false, were made in bad faith and with the intent to tarnish Dr. Belnap's reputation and practice. Such representations were also likely made to support any attempts by SLRMC's representatives to terminate Dr. Belnap's staff membership at SLRMC in the future, which should not be permitted.

71.     SLRMC's August 2013 letter addressing the Fair Hearing and the "extension of privileges" also constitutes a published statement that is not privileged and which is deliberately worded to indicate to any reviewing regulatory or insurance agency that they should audit or inquire further regarding Dr. Belnap's status at SLRMC.

72.     The representation that Dr. Belnap has a limitation or extension on his privileges due to any outcome at the Fair Hearing in 2013 is false, was made in bad faith, and also will cause damage to Dr. Belnap's practice and professional reputation.

73.     Any notification by SLRMC to Molina Healthcare indicating that Dr. Belnap no longer had privileges at Salt Lake Regional Medical Center is also false, was made in bad faith, and is causing continuing damage to Dr. Belnap's practice and professional reputation. The notification is also currently harming his patients who, if they elect to have Dr. Belnap perform any procedures, face no insurance coverage if they are under a Molina Healthcare plan, until Dr. Belnap can appeal the decision and/or be reinstated back onto the panel.

74.     As a result of Defendants' actions, Dr. Belnap has been irreparably injured and damaged and is entitled to actual and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

### FIFTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress Against All Defendants)**

75.     Plaintiff hereby incorporates paragraphs 1 through 74 above.

76.     Defendants' conduct was outrageous and intolerable.  Their actions resulting in the summary suspension of Dr. Belnap with the surrounding circumstances as set forth above constitute intentional infliction of mental and emotional distress.

77.     By their actions, Defendants have acted intentionally and recklessly to exclude Dr. Belnap from SLRMC during the suspension with the intended purpose of denying Dr. Belnap the opportunity to perform the professional services for which he has been trained. Defendants' actions have also effectively barred the creation of a Center that was promised to Dr. Belnap when he came to SLRMC.  Defendants' actions have damaged any opportunity for Dr. Belnap to build a good relationship with new administration at SLRMC in the future.

78.     As a direct result of Defendants' actions, Dr. Belnap has been irreparably injured and suffers emotional distress and will continue to suffer actual damages including damages for lost profits.  As a result, Dr. Belnap is entitled to actual, consequential and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

### SIXTH CAUSE OF ACTION
**(Application for Injunctive Relief Against All Defendants)**

79.     Plaintiff hereby incorporates paragraphs 1 through 78 above.

80.     Defendants' actions have harmed and threaten to harm the general public by interfering with the orderly practice of medicine in the community, by depriving patients of the quality of medical care they would have received but for Defendants' actions against Dr. Belnap, and by jeopardizing patient safety by removing Dr. Belnap from the Hospital during the suspension.  Those actions led to patients being treated by less qualified surgeons.

81.     As a result of the numerous and ongoing violations of federal and state law, Dr. Belnap is entitled to injunctive relief prohibiting Defendants from restraining competition within the marketplace, defaming Dr. Belnap, or his practice, and/or unreasonably scrutinizing Dr. Belnap, or his practice at SLRMC, which would include conducting outside reviews of his cases for unexplained and improper reasons.

82.     As a result of the numerous and ongoing violations of federal and state law, Dr. Belnap is further entitled to injunctive relief requiring Defendants to publish and circulate a statement in an appropriate publication confirming the support of Dr. Belnap.  In addition, Defendants will be required to retract any and all negative information regarding Dr. Belnap from all other regulatory, credentialing, insurance, or other organizations.

### SEVENTH CAUSE OF ACTION
**(Request for Declaratory Relief For Violation Of The Federal Health Care Quality Improvement Act Against All Defendants)**

83.     Plaintiff hereby incorporates paragraphs 1 through 82 above.

84.     The Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101–11152, permits immunity to attach to review activities provided the reviews meet certain procedural requirements.

85.     In the instant case, the Defendants forfeited their immunity under HCQIA because their actions were taken in bad faith and not in the reasonable belief that the actions were in furtherance of quality health care because patient care was never at issue.   Rather the preponderance of the evidence demonstrates that Defendants' actions were taken to promote the improper goal of terminating Dr. Belnap's active staff membership at SLRMC and removing him from the Hospital and marketplace.   Further, Defendants did not make a reasonable effort to obtain all the facts and the evidence they did have was concealed and/or misused at the Fair Hearing.   Defendants also acted in bad faith by engaging in the investigation and peer review process without a legitimate purpose as demonstrated by the statements made by Defendants indicating a desire to get Dr. Belnap fired. These actions were made in bad faith and with malice as the request for revocation of privileges was not warranted based on the actual facts.

86.     As a direct and proximate result of the actions of Defendants, Dr. Belnap has expended a considerable monetary amount that Dr. Belnap would not otherwise have been required to spend due to the necessity of overcoming the attempts of the Defendants to eliminate Dr. Belnap's surgery practice.

87.     As a result of the foregoing, Dr. Belnap seeks a declaration from this Court that the Defendants are not entitled to immunity for their individual and collective actions under federal or state law.

## **PRAYER FOR RELIEF**

WHEREAS, Plaintiff prays for relief against Defendants as follows:

1.     A decree from this Court that Defendants have engaged in an unlawful attempt to conspire and to remove or inhibit competition, in violation of federal anti-trust laws;

2.      A decree from this Court that Defendants are not entitled to immunity under federal or state law;

3.      An award of actual damages as proven at trial on all appropriate claims in the Complaint;

4.      An award of all statutory damages as allowed by federal or state law;

5.      That each of the Defendants and its respective officers, agents, attorneys, and employees, and all other persons acting or planning to act on behalf thereof, or in concert therewith be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid conspiracy, and from adopting or following any practice, plan, program or design, having a similar purpose or effect;

6.      That this Court grant an injunction against the Defendants from enforcing or taking any professional review action which adversely affects Dr. Belnap's privileges at the Hospital without justification;

7.      An award of punitive or treble damages as allowed by law;

8.      An award of pre-judgment and post-judgment interest as allowed by law;

9.      An award of costs and attorneys' fees incurred by Plaintiff herein as allowed by law; and,

10.     Any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action for which a jury is permitted.

DATED this 7th day of February, 2014.

**STIRBA, P.C.**


By:      /s/ Julia D. Kyte
PETER STIRBA
JULIA D. KYTE
JEFFREY D. MANN
Attorneys for Plaintiff LeGrand P. Belnap,
M.D.