IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LEGRAND P. BELNAP, M.D.,<br><br>                         Plaintiff,<br><br>v.<br><br>IASIS HEALTHCARE CORPORATION, a Delaware corporation; SALT LAKE REGIONAL MEDICAL CENTER, L.P., a Delaware limited partnership, D.B.A. SALT LAKE REGIONAL MEDICAL CENTER; BEN HOWARD, M.D.; ALAN DAVIS, M.D.; ANGELO CHACHAS, M.D.; WANDA UPDIKE, M.D.; KATHY OLESON; and DOES 1–10,<br>                         Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO STAY LITIGATION AND COMPEL ARBITRATION**<br><br>Case No. 2:14-cv-00086-DN<br><br>District Judge David Nuffer |

Salt Lake City Regional Medical Center ("SLRMC"), individual doctors, and Iasis Healthcare Corporation, (collectively, "Defendants") move to stay and compel mediation and/or arbitration of all the causes of action brought by plaintiff Dr. Legrand P. Belnap ("Belnap").[1] The Defendants argue all of Belnap's causes of action arise under or relate to a contract between Belnap and SLRMC, which contains an alternative dispute resolution provision.

After review of the parties' filings, and for the reasons set forth herein, the Defendants' motion to stay is GRANTED IN PART and DENIED IN PART. Belnap's first cause of action as against SLRMC is STAYED, and Belnap and SLRMC are ORDERED to arbitrate, including the question of arbitrability, for the first cause of action. Defendants' motion to stay the remaining six causes of action is DENIED.

---

[1] Defendants' Motion to Stay the Litigation and to Compel Mediation and/or Arbitration of All Claims ("Motion"), docket no. 33, filed April 1, 2014.

Background Facts............................................................................................................ 2
    The Agreement for the Center for Abdominal Treatment ................................. 2
    The Incident and the Review ............................................................................ 4
    The Complaint ................................................................................................... 5
Issues on This Motion.................................................................................................. 8
Discussion ................................................................................................................... 10
    Not All Claims are Within the Agreement ...................................................... 10
    The First Cause of Action is Within the Scope of the Agreement................... 15
    The Remaining Six Causes of Action Are Outside the Scope of the Agreement............ 16
    Determining the Scope of the Agreement Precedes the Question of  Who Decides
        Arbitrability............................................................................................. 17
Conclusion ................................................................................................................... 18
Order ............................................................................................................................ 18

## BACKGROUND FACTS

Belnap is a surgeon who specializes in organ transplantation and complex cancer cases.[2]

He has been an active staff member with full surgical privileges at SLRMC since 2009.[3]

### The Agreement for the Center for Abdominal Treatment

On February 1, 2012, Belnap entered into a Management Services Agreement

("Agreement") with SLRMC to manage the Hepatic Surgical department's new Abdominal

Treatment Program.[4] The "activities of the Hepatic Surgical department devoted to a [sic]

Abdominal Treatment Program [were] jointly [known] as the 'Center.'"[5] Belnap's specific

responsibilities under the Agreement were to help establish the Center;[6] assist in its day-to-day

operation;[7] manage and provide for all non-SLRMC personnel working for the Center;[8] and

---

[2] Complaint and Jury Demand (Complaint) at ¶ 12, docket no. 2, filed Feb. 7, 2014.

[3] *Id.* at ¶ 14.

[4] Management Services Agreement ("Agreement"), Recitals at ¶ 5, attached as Exhibit A to the Motion, docket no. 33-2, filed April 1, 2014.

[5] *Id.*

[6] *Id.* at § 1.1.

[7] *Id.* at § 1.2.

[8] *Id.* at § 1.3.

ensure it "maintain[ed] its status as an advanced abdominal center of excellence."[9] Belnap's responsibilities were described as "Services" in the Agreement [10] and were "expressly limited to . . . the Center and the Abdominal Treatment Program."[11] Under the Agreement, SLRMC's responsibilities included, among others, making facilities and resources available to the Center; maintaining all appropriate credentials; and "develop[ing] a strategic plan, budget, and proposed timeline for financing, constructing, and obtaining appropriate regulatory approvals for the Center."[12]

After reciting Belnap's and SLRMC's responsibilities, the Agreement states:

The relationship created between [SLRMC] and [Belnap] is strictly that of an independent contractor with respect to the Services described in this Agreement. Nothing contained herein shall be construed as creating any other type of relationship between the Parties other than one of independent contractors. This Agreement is entered into strictly for the purpose of obtaining the Services.[13]

The final section of the Agreement describes the means for resolving disputes. Under this section SLRMC and Belnap must first "attempt to settle any dispute between them . . . arising under or related to [the] Agreement informally."[14] If the parties are unable to settle the dispute informally, they are "to resolve the dispute through mediation and if mediation fails, [through] arbitration."[15] The Agreement provides that mediation "shall be initiated by a Disputant, and shall be conducted[] in accordance with the JAMS mediation guidelines."[16] The Agreement

---

[9] *Id.* at § 1.4.

[10] *Id.* at § 1.

[11] *Id.*

[12] *Id.* at § 3.2.

[13] *Id.* § 5.1.

[14] *Id.* at § 24.

[15] *Id.*

[16] *Id.* at § 24.1.

likewise states arbitration "shall be administered by JAMS and conducted in accordance with its Streamlined Arbitration Rules and Procedures."[17]

According to Belnap, SLRMC has not established the Center.[18] The Complaint and all subsequent filings by the parties are silent on any progress made to establish it.

### The Incident and the Review

In the first part of 2013, Belnap allegedly offended a female employee.[19] This employee's complaint led to a disciplinary review of Belnap by the Medical Executive Committee (MEC).[20] On March 18, 2013, the MEC suspended Belnap's medical privileges.[21] Belnap challenged the MEC's suspension by requesting a Fair Hearing.[22] At the end of April, 2013, the Fair Hearing Committee (FHC) met and, according to Belnap, ultimately decided that the MEC's suspension was "not supported by the evidence, and [was] arbitrary and capricious."[23] The FHC made the recommendation that the MEC vacate Belnap's suspension.[24] The MEC adopted the recommendations.[25]

While Belnap was suspended, SLRMC sent a report to the National Practitioner Data Bank regarding the suspension.[26] According to Belnap, when the MEC adopted the FHC's recommendations, SLRMC voided that report but "failed to notify other organizations that the

---

[17] *Id.* at § 24.2.

[18] Plaintiff's Memorandum in Opposition to Defendants' Motion to Stay the Litigation and to Compel Mediation and/or Arbitration of All Claims (Opposition) at 9, docket no. 34, filed April 15, 2014.

[19] Complaint at ¶ 23.

[20] *Id.*

[21] *Id.*

[22] *Id.* at ¶ 28.

[23] *Id.* at ¶ 30.

[24] *Id.* at ¶ 29–30.

[25] *Id.* at ¶ 31.

[26] *Id.* at ¶ 37.

report had been retracted, which triggered inquiries from various entities."[27] Belnap states that the failure to do so was borne from a desire "to remove [him] from the market and damage his ability to practice as a surgeon."[28]

According to Belnap, subsequent to his suspension being lifted, the interim CEO departed from the typical employment renewal process by renewing his staff privileges for three months instead of two years.[29] Belnap alleges that this truncated renewal was unwarranted. He further alleges that the short renewal forced him to describe his privileges as provisional to regulatory and insurance entities.[30] According to Belnap, this led Molina Healthcare, an insurance provider in Utah, to terminate him from its network.[31]

### The Complaint

Belnap's complaint contains seven causes of action. In the first cause of action, Belnap alleges that all Defendants violated the Sherman and Clayton acts by attempting to eliminate him from the market. Belnap alleges various results of, and perhaps motives for, this restraint on trade.[32] These include "reducing or eliminating [his] ability to provide medical services to other facilities within the marketplace and elsewhere";[33] "limiting, reducing or eliminating [his] services from the significant percentage of the marketplace he served prior to Defendants' conduct";[34] and "eliminating [his] access to surgical facilities, equipment, medicine and staff,

---

[27] *Id.*

[28] *Id.* at ¶ 45.

[29] *Id.* at ¶ 38.

[30] *Id.* at ¶ 41.

[31] *Id.* at ¶ 43.

[32] *See id.* at 49–51.

[33] *Id.* at ¶ 49d.

[34] *Id.* at ¶ 49a.

during his suspensions and . . . not creating the Center promised to him, . . . thereby prohibiting [his] ability to properly care for and treat patients . . . ."[35] This claim is summarized as follows:

> Defendants engaged in a verbal contract, combination, or conspiracy, and/or concerted action by committing to a common scheme with an illegal objective; to eliminate Belnap as a competitor by suspending his privileges and eliminating his patients' access to his services in the medical care market.[36]

In the second cause of action Belnap alleges SLRMC breached its contract by violating its bylaws. Belnap asserts "[t]he governing Bylaws at SLRMC are a contract between the hospital and the physician[,]"[37] and SLRMC breached the contract "when they failed to follow proper investigation procedures under Section 9.1(c) of the Bylaws";[38] "when they sought the harshest sanctions possible under Section 8.1(d), when the evidence did not support the recommendations";[39] and "by failing to act in good faith [e.g., failure to pursue peer review] while enacting the suspension and corrective action against Belnap, in violation of Sections 9.1(a) and . . . 14.7(c) of the Bylaws."[40]

Similarly, in his third cause of action for breach of the implied covenant of good faith and fair dealing, Belnap alleges that, "in violation of SLRMC's Bylaws . . . Sections 8.1(a), (c), . . . (d)[,] and 14.7(c),"[41] the Defendants "breached this covenant by and through their actions made in bad faith and with malice to achieve [his] suspension."[42]

---

[35] *Id.* at ¶ 49e.

[36] *Id.* at ¶ 47.

[37] *Id*. at ¶ 54.

[38] *Id*. at ¶ 55.

[39] *Id.* at ¶ 56.

[40] *Id.* at ¶ 58.

[41] *Id.* at ¶ 62.

[42] *Id.*

Belnap alleges in the fourth cause of action that all the Defendants damaged his reputation by making oral and printed false representations about the MEC and Fair Hearing proceedings. For instance, when his staff privileges were "'extended' for three months,"[43] the CEO notified him by a letter "that [was] not privileged and which [was] deliberately worded to indicate to any reviewing regulatory or insurance agency that they should audit or inquire further regarding [his] status at SLRMC."[44] On information and belief, Belnap further alleges that SLRMC representative physicians and employees, falsely notified "Molina Healthcare that [he] no longer had privileges at SLRMC"[45] and "made false oral statements to third parties at the hospital and in the medical community outside of the privileged Fair Hearing proceedings, alleging that [he] committed wrongful acts sufficient to justify his suspension."[46]

In the fifth cause of action Belnap alleges that all the Defendants intentionally inflicted emotional distress by the way they handled the MEC hearing and subsequent suspension.[47] He asserts that they "acted intentionally and recklessly to exclude [him] from SLRMC during the suspension."[48] This prevented him from "perform[ing] the professional services for which he [was] trained,"[49] and "effectively barred the creation of the Center."[50] Additionally, Belnap alleges that the Defendants' actions "damaged any opportunity for [him] to build a good relationship with new administration at SLRMC in the future."[51]

---

[43] *Id.* at ¶ 38 (presumably quoting the letter).

[44] *Id.* at ¶ 71.

[45] *Id.* at ¶ 67.

[46] *Id.* at ¶ 69.

[47] *Id.* at ¶ 76.

[48] *Id.* at ¶ 77.

[49] *Id.*

[50] *Id.*

[51] *Id.*

In the sixth cause of action Belnap seeks injunctive relief against all of the Defendants. Belnap would enjoin the Defendants from restraining competition, making defamatory allegations, and unreasonably scrutinizing his practice. Additionally Belnap would have the Defendants "publish and circulate a statement in an appropriate publication confirming the support of Belnap,"[52] and retract any negative information regarding him.

In the last cause of action Belnap seeks declaratory relief from the application of the Federal Health Care Quality Improvement Act, which gives immunity to medical boards of review and imposes serious repercussions on those who bring suit against them.[53]

## ISSUES ON THIS MOTION

The Defendants move "to stay this litigation and to compel the mediation and/or arbitration of all counts asserted in the Complaint in accordance with the binding dispute resolution clause in the . . . Agreement."[54] The Defendants characterize this lawsuit as being "about an internal review proceeding conducted by the Medical Executive Committee . . . at Salt Lake Regional Medical Center . . . of certain sexual harassment allegations and other claims of improper behavior involving Plaintiff, LeGrand P. Belnap, M.D."[55] After outlining Belnap's causes of action, the Defendants state: "All of these causes of action arise under or relate to the Agreement because all of them are premised on the same alleged misconduct and resulting harm to Plaintiff."[56] The Defendants justify this assertion by stating,

> According to the Complaint, prior to the suspension SLRMC had "promised Dr. Belnap that an advanced abdominal center of excellence . . . would be created for him to oversee," but as a result of Defendants' allegedly improper acts in

---

[52] *Id.* at ¶ 82.

[53] *Id.* at ¶¶ 84-87.

[54] Motion at 1.

[55] *Id.*

[56] *Id.* at 2.

8

connection with the suspension, the Hospital failed to create and open the Center.[57]

Consequently, they argue that because "the Complaint's counts expressly rely on and incorporate Plaintiff's allegations regarding the Center,"[58] the "dispute . . . arise[s] out of, or relat[es] to th[e] Agreement."[59] And, they further assert, because "arising under" or "related to" is generally "construed broadly[,] any controversy that 'touch[es]' upon the Agreement"[60] is presumed arbitrable. Furthermore, the Defendants argue, "there is a presumption of arbitrability of collateral matters so long as the claim implicates the parties' obligations under the agreement containing the arbitration clause."[61]

Defendants further argue that if there are questions regarding whether these claims fall under the arbitration clause (i.e. questions of arbitrability), that such questions are left for the arbitrator to decide because the parties incorporated the JAMS rules into their Agreement.[62] Under JAMS rules, questions of arbitrability are resolved by the arbitrator.[63]

Belnap argues that "[t]he gravamen of [the] Complaint has nothing to do with a Center but rather is focused on the suspension that occurred in 2013, where *but for* the improper disciplinary proceedings that surrounded his suspension this lawsuit would not exist."[64] Regarding the reference to the Center, Belnap states, the "minimal reference to the Center as a damages component of the Defendants' anti-competitive actions should not trigger application of

---

[57] *Id.* at 3 (quoting Complaint at ¶¶ 20–22).

[58] *Id.* at 8.

[59] Agreement at § 24.

[60] Motion at 6.

[61] *Id.* at 7.

[62] *Id.* at 9.

[63] JAMS Streamlined Arb. R. & P. 8(c) ("Jurisdictional and arbitrability disputes . . . shall be submitted to and ruled on by the arbitrator.")

[64] Opposition at 1.

the Agreement."[65] Belnap argues that the matter in question—his suspension—did not itself reference the Agreement, and that "the parties proceeded in 2013 [during the suspension investigation] in accordance with [SLRMC's Bylaws] and not the 2012 Agreement."[66] Additionally, Belnap attempts to show the Agreement's arbitration clause is narrow, thus negating the presumption of arbitrability, by reading it to mean only matters arbitrable using exclusively Utah law.

## DISCUSSION

Because the Agreement between Belnap and SLRMC is one "involving commerce,"[67] the Federal Arbitration Act (FAA) governs. The FAA "requires a district court to stay judicial proceedings where a written agreement provides for the arbitration of the dispute that is the subject of the litigation."[68] Because "[t]here is a strong federal policy favoring arbitration for dispute resolution, . . . [a]ll doubts are . . . resolved in favor of arbitrability."[69] The FAA "leaves no place for the exercise of discretion by a district court but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."[70]

### Not All Claims are Within the Agreement

When one party alleges the dispute is subject to an agreement to arbitrate, the court must first determine if the claims are within the scope of the contract within which the agreement to arbitrate is nested. The Tenth Circuit stated, "A dispute within the scope of the contract is still a

---

[65] *Id.*

[66] *Id.*

[67] 9 U.S.C. § 2.

[68] *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995). *See also* 9 U.S.C. § 3.

[69] *Id.* at 1514 (citations omitted).

[70] *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

condition precedent to . . . involuntary arbitration."[71] In *Parfi Holding AB v. Mirror Image Internet Inc.*,[72] the Supreme Court of Delaware similarly stated,

> An arbitration clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement. Thus, arbitration clauses should be applied only to claims that bear on the duties and obligations under the agreement. The policy that favors alternate dispute resolution mechanisms, such as arbitration, does not trump basic principles of contract interpretation.[73]

As *Parfi*'s visual language suggests, the extreme limit of the arbitration clause's scope is the scope of the contract within which it is embedded. It may be possible in the abstract for an arbitration clause's scope to extend beyond the scope of the contract, but in reality the scope of the contract is the absolute limit.

Two cases that illustrate this distinction and relationship between the scope of the clause and scope of the contract are *Coors Brewing Co. v. Molson Breweries*[74] from the Tenth Circuit and *Stone v. Doerge*[75] from the Seventh Circuit.

In *Coors*, Coors "entered into a licensing agreement with Molson Breweries . . ., a Canadian corporation. Coors and Molson agreed that Molson would brew and distribute Coors products in Canada."[76] Their agreement contained an arbitration clause that stated, "Any dispute

---

[71] *Coors*, 51 F.3d at 1516 (citations omitted).

[72] 817 A.2d 149 (Del. 2002).

[73] *Id.* at 156 (citations omitted). *See also Leadertex Inc. v. Morganton Dyeing and Finishing Corp.*, 67 F.3d 20, 28–29 (2nd Cir. 1995) (holding that even though the defamatory act may "touch upon" the parties' agreement it extended beyond the scope of the contract and was thus not subject to arbitration); *Brown v. Coleman*, 220 F.3d 1180, 1184 (10th Cir. 2000) (citing *Leadertex*, finding that the claim "must be closely examined to see whether it extends to matters beyond the parties' contractual relationship"); *Chassereau v. Global Sun Pools, Inc.*, 373 S.C. 168, 172 (S.C. Sup. Ct. 2007) (holding "[a]lthough we are constrained to resolve all doubts in favor of arbitration, this is not an absolute truism intended to replace careful judicial analysis. While actions taken in an arrangement such as the one entered into by these parties might have the potential to generate several legal claims and causes of action [which would be arbitrable], we have no doubt that Chassereau did not intend to agree to arbitrate the claims she asserts in the instant case.").

[74] 51 F.3d 1511 (10th Cir. 1995).

[75] 328 F.3d 343 (7th Cir. 2003).

[76] *Coors Brewing*, 51 F.3d at 1512.

arising in connection with the implementation, interpretation or enforcement of this Agreement . . . shall be finally settled under the Rules of the American Arbitration Association."[77] After Coors gave Molson access to "trademarks, brewing processes, and marketing information,"[78] Molson entered into a partnership with Miller Brewing Company, a U.S. competitor of Coors. The Miller–Molson agreement "gave Miller one seat on Molson's board of directors and created a reciprocal licensing arrangement." After that partnership was formed, Coors sued Molson and Miller for "antitrust violations of the Clayton and Sherman Acts."[79] Molson moved to stay the litigation per the arbitration clause in the licensing agreement. Coors contested the stay arguing first "that the arbitration clause in the . . . agreement is a narrow arbitration clause and that it does not include antitrust disputes" and second that Coors's "antitrust claims are outside the scope of the contract and thus not subject to the contractual arbitration clause."[80]

The court found that the scope of the arbitration clause was not as narrow as Coors claimed and that its plain meaning "cover[ed] antitrust disputes."[81] The court then explained the relationship between the scope of the clause and the scope of the contract:

> [A]ll disputes between parties who include an arbitration clause in their contracts are [not] subject to arbitration. A dispute within the scope of the contract is still a condition precedent to the involuntary arbitration of . . . claims. . . . A contrary [approach] . . . could lead to absurd results. For example, if two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract. In other words, with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship. Similarly, in this case, Coors is entitled to litigate its antitrust claims regarding the Miller–

---

[77] *Id.* at 1513.

[78] *Id.*

[79] *Id.*

[80] *Id.* at 1515.

[81] *Id.*

Molson relationship in a public forum so long as the claims are not related *to the licensing agreement*.[82]

The court then went through each of the antitrust claims and found only one "involve[d] the Coors–Molson licensing agreement,"[83] and was thus the only claim subject to arbitration. The other claims may have been "covered" by the arbitration clause (i.e. within its scope), but were not within the scope of the licensing agreement.

In *Stone*, the defendant Doerge and his employer[84] handled securities transactions for two trusts of which Stone, the plaintiff, was the trustee. Doerge used Bear Stearns Securities Corp. as the clearing broker in some of those transactions. In those transactions for which it was the clearing broker, Bear Stearns "insisted that Stone agree to arbitrate any ensuing dispute. The contract that Stone signed with Bear Sterns commit[ed] the parties to arbitrate any 'controversies arising between [the trusts] and any Bear Stearns entity or any broker for which Bear Stearns acts as clearing agent.'"[85] In the dispute that was the subject of the litigation, Stone alleged that Doerge committed fraud in connection with several private placements. For those placements, Bear Stearns "played no role in either the advice given or the execution of the private placements."[86] Nevertheless, Doerge contended that the agreement between Stone and Bear Stearns subjected the fraud claims to arbitration. The court responded:

> Nothing in the Federal Arbitration Act overrides normal rules of contractual interpretation; the Act's goal was to put arbitration on a par with other contracts and eliminate any vestige of old rules disfavoring arbitration. Arbitration depends on agreement, and nothing beats normal rules of contract law to determine what the parties' agreement entails. There is no denying that many decisions proclaim

---

[82] *Id.* at 1516 (emphasis added, citations omitted).

[83] *Id.* at 1517.

[84] The employer's name is Balis, Lewittes & Coleman, Inc. To avoid confusion, "Doerge" will stand in for both the employer and employee.

[85] *Stone*, 328 F.3d at 344.

[86] *Id.*

that federal policy favors arbitration, but this differs from saying that courts read contracts to foist arbitration on parties who have not genuinely agreed to that device . . . . Our job in a case such as this is to implement the *parties'* preferences between judicial and arbitral forums, not to displace that choice with one of our own.[87]

The contract between Stone and Bear Stearns makes sense if understood to consolidate, into one arbitral forum, all parties and disputes arising out of securities transactions handled by or through Bear Stearns. It makes little sense, and has a potential for erratic results, if read to cover transactions in which Bear Stearns played no role. On [Doerge's] reading, if one of [Doerge's] employees' cars, carrying stock certificates, hit a vehicle in which Stone was a passenger, then any negligence action commenced by Stone must be arbitrated because of the happenstance that (a) Stone has signed a securities contract with Bear Stearns, and (b) [Doerge] sometimes acts as an introducing broker for Bear Stearns . . . . This kind of wacky result can be avoided by reading the contract as requiring arbitration if, and only if, Bear Stearns cleared the trades that gave rise to a securities dispute.[88]

In other words, the agreement between Bear Stearns and Stone had an arbitration clause with a scope wide enough to capture the type of claim in question, but the scope of the contract that contained the arbitration clause was not broad enough to include a transaction in which Bear Stearns was not the clearing broker.  This precluded a broad (or as the opinion put it, "wacky") application of the clause.

Similar to *Coors* and *Stone*, the arbitration clause within Belnap's and SLRMC's Agreement is broad in the abstract and would likely cover the current causes of action. The clause states that

[t]he parties shall . . . attempt to settle any dispute between them . . . arising under or related to this Agreement informally. If the Disputants are unable to resolve the dispute informally, the Disputants shall seek to resolve the dispute through mediation and if mediation fails, shall have the dispute resolved by arbitration.

---

[87] *Id.* at 345–46.

[88] *Id.* at 346.

Courts have consistently held that language such as "any dispute" and "related to" is the broadest language available.[89] Accordingly, much as it was conceivable that antitrust disputes were covered by the Coors-Molson agreement, it is likewise conceivable that this clause could embrace the many types of claims in Belnap's complaint if they were shown to "relate to" the Agreement for the Center.

However, just as in *Coors* and *Stone*, the court must perform a preliminary analysis of all of the claims to determine if they fall within the scope of the contract. Or as *Coors* phrases it, the court must determine if those claims "implicate the contract"[90] such that the arbitration clause within it is triggered.

### The First Cause of Action is Within the Scope of the Agreement

Belnap's first cause of action against all of the Defendants is for combination and conspiracy in restraint of trade. This cause of action makes numerous references to the Center:

> Defendants' unlawful efforts have also prevented the creation of Dr. Belnap's specialty abdominal or transplant center in the marketplace, thereby reducing future competition, in violation of federal anti-trust laws.[91]

> Defendants' efforts to eliminate Dr. Belnap, reduce competition, and prevent the market entry of a new and more efficient transplant or abdominal surgery specialty center in the marketplace have also succeeded, inter alia:
>> . . . .
>> . . . by not creating the Center promised to him, Defendants are thereby prohibiting Dr. Belnap's ability to properly care for and treat patients and, in turn, engage in his lawful profession and earn a living.[92]

> Defendants' unlawful actions . . . to achieve an illegal objective to eliminate Plaintiff as a competitor, reduce competition, reduce quality, avoid price

---

[89] *See, e.g.*, *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1196–98 (10th Cir. 2009).

[90] *Coors*, 51 F.3d at 1516.

[91] Complaint at ¶ 48.

[92] *Id.* at ¶ 49.

competition and prevent the entry of a new and efficient abdominal surgery specialty center in the marketplace . . . .[93]

While Belnap argues these references are merely "a damages component of the Defendants' anti-competitive actions,"[94] the Agreement provided that the Center would be created and Belnap alleges it was not created because of the Defendants' alleged anticompetitive actions. According to Belnap, SLRMC had a duty to create the Center, and the alleged anticompetitive actions are in direct conflict with that duty. Therefore, this cause of action *against SLRMC* is within the scope of the contract, and, as discussed more below, may be subject to arbitration if the arbitrator determine s it is subject to arbitration. This cause of action against SLRMC shall be stayed pending the arbitration proceedings.

The antitrust claim against the remaining defendants shall not be stayed. *See THI of N.M. at Vida Encantada, LLC v. Lovato*, 848 F.Supp.2d 1309, 1329-32 (10th Cir. 2012) (allowing arbitration to proceed only as to signatory); and *CollegeAmerica Servs., Inc. v. Western Ben. Solutions, LLC*, No. 2:11-cv-01208-DS, 2012 WL 1559745 (D.Utah May 2, 2012) (same, under Utah law analysis).

**The Remaining Six Causes of Action Are Outside the Scope of the Agreement**

The plain language of the Agreement clarifies that the Agreement is not a general employment contract governing every aspect of Belnap's relationship with SLRMC. Rather, it is a contract with a specific and limited scope: "This Agreement is entered into strictly for the purpose of obtaining the Services."[95] In section 1 it states that the term "Services" used

---

[93] *Id.* at ¶ 50.

[94] Opposition at 1.

[95] Agreement at § 5.1.

throughout the Agreement would be "expressly limited to[] the Center and the Abdominal Treatment Program."[96]

The disputes in the remaining six causes of action are not within the scope of these "Services." Each of those six claims centers on the investigation of an incident, ruling, and subsequent punishment by the MEC wholly unrelated to the "Services" contemplated under the Agreement for the Center. Nothing in the Agreement would suggest either Belnap or SLRMC envisioned the Agreement to cover future claims (e.g., violations of SLRMC's bylaws,[97] defamation,[98] intentional infliction of emotional distress[99]) relating to the MEC review of an alleged sexual harassment claim. Returning to the hypothetical in *Coors*, it would be absurd to subject these claims to the arbitration clause within the Agreement for the Center because "it is simply fortuitous that the parties happened to have a contractual relationship."[100] To read this any differently would be "to foist arbitration on parties who have not genuinely agreed to that device."[101]

### Determining the Scope of the Agreement Precedes the Question of Who Decides Arbitrability

The Defendants argue that if there is any question regarding the arbitrability of any claim the litigation should be stayed because "[t]he parties' arbitration clause evidences their clear intent that any question of arbitrability—*i.e.*, whether a claim should be arbitrated—should be determined by the arbitrator." It is true that incorporating "the JAMS rules demonstrates the

---

[96] *Id.* at § 1.

[97] Belnap's second and third causes of action.

[98] Belnap's fourth cause of action.

[99] Belnap's fifth cause of action.

[100] *Coors*, 51 F.3d at 1516.

[101] *Stone*, 328 F.3d at 345.

parties' clear and unmistakable intent to submit questions of arbitrability to the arbitrator."[102]

Determining whether the claims are within the scope of the contract, however, necessarily

precedes any question of arbitrability, and precedes the question of who decides questions of

arbitrability. Arbitration clauses are still creatures of the contracts in which they are embedded.

The analysis does not change because under one particular contract the parties have agreed an

arbitrator will decide arbitrability. "A dispute within the scope of the contract is still a condition

precedent to . . . involuntary arbitration."[103] *Coors*'s hypothetical that demonstrates the absurd

results of forcing a party to arbitrate simply because it has an unrelated contract with a general

arbitration clause only becomes more absurd if a court were to decide that because the parties at

some point agreed an arbitrator would decide arbitrability every subsequent dispute, no matter

how unrelated to the Agreement, would first have to be screened by an arbitrator before it could

go to litigation. The arbitrator will decide arbitrability of the First Cause of Action against

SLRMC, and then if arbitrable, will proceed to arbitration. The arbitrator may, for example, find

that conditions precedent to arbitration must be fulfilled.

## CONCLUSION

Of Belnap's seven claims, six are outside the scope of the Agreement and thus litigable.

Only the first cause of action  against SLRMC is within the scope of the Agreement.

## ORDER

IT IS HEREBY ORDERED that Defendants' Motion to Stay the Litigation and to

Compel Mediation and/or Arbitration of All Claims[104] is DENIED IN PART and GRANTED IN

---

[102] Motion at 9.

[103] *Coors*, 51 F.3d at 1516 (citations omitted).

[104] Docket no. 33, filed April 1, 2014.

PART. The first cause of action is STAYED as to SLRMC. Belnap and SLRMC are ORDERED

to proceed to arbitration on the arbitrability of that claim.

      IT IS FURTHER ORDERED that the parties shall meet, confer, and on or before

February 10, 2015, file an attorneys' planning meeting report, and submit a proposed scheduling

order as outlined at http://www.utd.uscourts.gov/documents/ipt.html.

      Dated January 27, 2015.

BY THE COURT:

David Nuffer
United States District Judge